THE WEST CHICAGO STREET RAILROAD COMPANY

*v.*

JOHN DWYER.

*Filed at Ottawa May 12, 1896—Rehearing denied October 13, 1896.*

1. INSTRUCTIONS—*a court need not give duplicate instructions.* A requested instruction fully contained, in substance, in others given is properly refused.

2. FELLOW-SERVANTS—*vice-principal—instruction as to apparent authority of offending servant.* An instruction, in an action for injuries to a gripman upon a cable car, that it is immaterial whether the person exercising the authority to direct and command was known as a foreman or by any other title, if clothed with such apparent authority, is not objectionable, on the ground that the master is not liable for negligence of one having only a special or limited authority not arising from the performance of duty.

3. SAME—*trial—whether a "starter" and a gripman are fellow-servants is a question of fact.* It is a question of fact for the jury whether or not a "starter" ordering the moving of a cable street car was a fellow-servant with a gripman of such car, and acting as such, or stood in the relation of the representative of the common master, with authority to command such gripman.

*West Chicago Street Railroad Co. v. Dwyer,* 57 Ill. App. 440, affirmed.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. JOHN GIBBONS, Judge, presiding.

The following is from the opinion of the Appellate Court rendered in this case:

"The appellee was a gripman in the employ of the appellant on the Madison street line of its cable road, in Chicago, and was injured while engaged in the performance of his duties as such gripman, on April 20, 1891. He had been in the service of the appellant since 1885 as a driver, until the cable system was put in operation, in 1890, and afterwards as a gripman. On the day of the injury, as he was operating his train, consisting of a grip car and one trailer, around the loop extending through

various streets from the east end of the Washington street tunnel under the river and back to the tunnel, he observed, when going west on Randolph street near Fifth avenue, that something was dragging under the grip car, and he stopped his train.  Until he stopped he did not know what the trouble was, but then, looking, he discovered that one of the slide-bars, which was an iron plate or beam fastened to and underneath the car, was loose, and so told the conductor.  After consulting with the conductor, appellee decided to proceed gently with his train to a point a block or two distant, where, at or just before the entrance to the tunnel was reached, a man named Smith, known as a 'starter' for the appellant, was stationed, and he did so.  When the train arrived near to where Smith was stationed it was stopped and he was called by the appellee.  According to the testimony of the appellee he told Smith that the slide-bar was loose and had dropped down, and that Smith ordered him to pull ahead to a man-hole, and sent a man to open the man-hole and go underneath to examine the car when it should arrive in place, and that he, Smith, then called, by electric signals at his command, a wrecking wagon and crew belonging to appellant and in its employ; that the wagon and crew arrived, and the grip machinery, already partly raised, was hoisted up and suspended to a hook in the roof of the grip-car, and that after the crew had got through with their work, Smith ordered a grip-car which had followed with another train behind the train in question, to be hitched to the trailer of appellee's train, and to proceed, pushing his grip-car and trailer ahead through the tunnel; that the grip machinery, which had been suspended within the grip-car, was hanging loose, and liable to swing so as to injure passengers on the grip-car, and that Smith ordered appellee to take hold of it to keep it steady.  Smith denied that he gave any orders to appellee, and denied that he had any authority to give orders of any kind in cases of broken

machinery, but says that when appellee came along with his train appellee told him that his grip was out of order, and asked him, Smith, to call the wrecking wagon, which he did, but that beyond doing that he exercised no authority or direction whatever in the matter. He does, however, testify that he coupled the train that came up in the rear, to the trailer of appellee's train.

"Just how extensive Smith's authority was as a 'starter' is a matter concerning which there is considerable conflict in the evidence. It is not disputed but that he wore a uniform and a badge with the word 'starter' on it, and was accustomed to giving orders to trainmen as they approached the tunnel, and his orders were accustomed to obedience; nor but that he was authorized to 'space' the distance between trains in order that they should not be run too close together in the tunnel, and, to that end, that he had authority to stop and start trains and to control gripmen and conductors in that matter. Beyond that it cannot be said with certainty what his authority, if any, extended to, although it is clear that he was actively engaged, as was probably his duty, in hastening such repairs as would enable the road to be cleared so that following trains might proceed on their route. It was admitted that the wrecking wagon and crew were kept steadily in the employ of the appellant, and, if not clearly proved, it must be presumed, from the evidence, that the crew were capable mechanics, possessing all the qualifications necessary to repair disabled trains,—to the extent, at least, of permitting them to cease being obstructions to the operation of the road and to be reasonably safe for use.

"Whether because of his duty, under the rules of the appellant, to remain in his appropriate place on his grip car until the end of the route had been reached, or because of the orders of Smith to stand in his box and steady the suspended grip machinery, the appellee did, in fact, resume his position in his usual box on the car,

and stood there in the act of steadying the hanging grip machinery while his train was being pushed through the tunnel.   Thus standing and holding the grip machinery, and as the train was proceeding out of the western end of the tunnel, the appellee again observed the same sound of something underneath the car grating against or dragging over the iron covers to the man-holes between the tracks, and while his attention was being directed towards ascertaining what the trouble was, a sudden jerk or jar was given to the car, and the handle to the track brake, which was in its proper place, suddenly flew back and struck him in the forehead, occasioning the injuries for which the judgment complained of was recovered. This brake handle, when perpendicular, reached four feet five and one-half inches above the floor of the car, and was of iron.   Immediately after the injury the train was stopped and another examination of the grip-car was made, and one of the slide-bars was found to be out of place, and down.  The slide-bar was then chained up, and the train proceeded on its route without further incident.

"It is not clear in just what manner the slide-bar, being loose, could have caused the brake to fly from its place in the direction of appellee, but from all the evidence it is impossible to discover any other cause for it, and it is fairly established by the evidence that the loose slide-bar, when hanging down, caught against the iron cover of a man-hole, and was in some manner thrown against the track-brake, which, in turn, caused its handle to fly back and hit appellee.   Now, it is established that the appellant, as an employer, was bound to use ordinary care to furnish to appellee, its employee, reasonably safe machinery and appliances, and a reasonably safe place to work in.   (*Libby* v. *Scherman*, 146 Ill. 540.)   Had the injury occurred during the passage of the train over the two or three blocks between the point where appellee first discovered that the slide-bar was loose and the point where Smith was stationed, and to which the wrecking crew

was called, quite a different question would have arisen. It might there well have been held that appellee, knowing of the defect, assumed the risk of a further operation of his train.

"We are inclined to think, from all the evidence, that Smith's authority extended so far as, after a defective car had been disclosed to him, to subject the trainmen, as to its further operation through the tunnel, to his direction. All trainmen, and appellee in particular, had always been in the habit of obeying his orders as to when to stop and when to move ahead, and it was his duty to give orders in such matters, and it was the duty of trainmen to obey him. It would seem to be unreasonable to hold that, having such authority, and a disclosed defect having been made known to him, and he having taken steps to have the defect remedied, employees accustomed to receive and obey orders from him should be at liberty to question his authority concerning further proceeding through the tunnel. The fact that it was his duty to stop and start trains so that collisions and other obstructions in the tunnel might be avoided, would seem to imply authority to stop or advance disabled trains at his discretion, in order to avoid like results from causes besides those incident to the running of trains too close together.

"We do not regard it as material whether Smith actually uttered the orders to appellee to proceed or not. There seems to be the greater weight of evidence that he did actually give appellee a verbal order to take his place in his grip-car and go on with the train, but if he did not speak the words he exercised equivalent directions. He, himself, testified that he coupled the trailer of appellee's train to the grip-car that was behind, and it is certain that thereafter the appellee's train was obliged to proceed, whether appellee was willing or not. According to the rules of appellant under which the appellee worked, it was his duty to keep in the place assigned to gripmen during all the time his car was in motion. So,

between his duty under general rules and the position in which his train was placed by being hitched to another possessing all the motive power of the two trains, we cannot easily conclude that appellee was in the exercise of any volition, short of quitting appellant's service, in standing by his car in the manner he did. Moreover, the appellee was not a mechanic. He had always worked for appellant either as the driver of a horse car or as a gripman, and after the wrecking crew had come, whether at his request or at the unsolicited call of Smith, and had taken possession of his car, with all the information he possessed as to the nature of the defect which they had come to repair or remedy, he had a right to believe in and rely upon their work as being sufficient to make the performance of his duty safe from the happening of accident for the cause which he had pointed out.

"The wrecking crew were not fellow-servants with appellee. Their duties were mechanical in kind, and as disconnected from his as those of the builders of his car were, and their acts were the acts of the appellant. The crew, on that occasion, was in charge and under the control of Mr. Gibbons, who, in testifying, described himself as 'foreman of street railroad construction,' and was presumably a competent mechanic, upon whom appellee had a right to depend. After the car had been put in condition to proceed, and the train had been attached to the grip-car that pushed it, he boarded the grip-car with appellee and rode standing up through the tunnel, and was on board when the accident happened, and it was under his supervision that the slide-bar was chained up after appellee had been hurt. It does not appear from his testimony that he heard any sound as of the slide-bar dragging until at the moment that it caught the cover of the man-hole, by which the accident was caused. After the train was stopped he found the cover under the fender of the grip-car that was pushing the train, about twenty-five feet from the man-hole from which it came.

From the fact that he heard no previous sound it would seem as if there was no such warning of imminent danger as made it the duty of the appellee to leave his post of duty or to signal the train to stop, and we think that his presence on the grip-car should be considered as in the nature of an additional assurance, if any other were needed, to the appellee, that the crew had done all that was necessary to make the appliances of the car secure against danger. Gibbons also testified that he rode through the tunnel because the grip-car was disabled by the grip having been taken out; that he rode standing up on the floor of the car and leaning against the center post on the right side of the car, a few feet in advance of appellee, and was looking after the condition of the floor of the tunnel. Presumably, if the man-hole cover had been raised or misplaced he would have observed it, but he saw nothing to warn him of danger. It does not appear that the grip machinery itself was broken or out of repair, nor that it needed to be taken out, except for the reason that it could not be safely operated with a loose slide-bar.

"The inferences from all the evidence is, we deem, conclusive that the accident was caused from the defective and loose slide-bar dragging and catching against the iron cover to the man-hole, and that the slide-bar was loose and dragging before the wrecking crew was called, and that the accident would not have happened if the slide-bar had been properly chained up by the wrecking crew before starting through the tunnel, in the manner it was done after the accident."

EGBERT JAMIESON, and VAN VECHTEN VEEDER, for appellant:

Even if it be held that this wrecking crew were guilty of negligence in the performance of a duty, we insist that this defendant cannot be held liable for that negligence, for the reason that the wrecking crew were, under the

uncontroverted facts in this case, fellow-servants with Dwyer. *Railway Co.* v. *Moranda*, 93 Ill. 302; *Railroad Co.* v. *May*, 108 id. 298; *Rolling Mill* v. *Johnson*, 114 id. 64; *Abend* v. *Railroad Co.* 111 id. 203; *Railroad Co.* v. *Keefe*, 47 id. 108; *Railway Co.* v. *Britz*, 72 id. 257; *Railroad Co.* v. *Geary*, 110 id. 383; *Valtez* v. *Railway Co.* 85 id. 501; *Railway Co.* v. *Murphy*, 53 id. 336; *Railroad Co.* v. *Touhy*, 26 Ill. App. 99; *Miller* v. *Railway Co.* 24 id. 326; *Railroad Co.* v. *McDonald*, 21 id. 409; *Railroad Co.* v. *Henry*, 7 id. 322; *Railroad Co.* v. *Schuring*, 4 id. 533.

BARNUM, HUMPHREY & BARNUM, for appellee.

Mr. JUSTICE CARTER delivered the opinion of the court:

The foregoing, from the opinion of the Appellate Court delivered by Mr. Justice SHEPARD, contains a full and clear statement of this case, and as all questions of fact have been finally settled by the judgment of that court, and as the principal questions of law relating to the instructions raised by counsel in this court have heretofore been determined by this court in other cases, this appeal may be disposed of within narrow limits.

But two points are made in this court by appellant. First, that the trial court erred in refusing to give to the jury the following instruction: "The jury are instructed, as a matter of law, that where a party has been injured for the want of ordinary care, such as a reasonable or prudent person would have exercised under the same circumstances, he cannot recover unless the injury is wantonly and willfully inflicted. And so, if the jury believe, from all the evidence in this cause, (there being no proof or claim herein of wanton or willful injury,) that the plaintiff did not exercise ordinary care at the time of sustaining the injury complained of, then they shall find for the defendant;" second, that the court instructed the jury erroneously upon the doctrine relating to vice-principals.

As to the first question, it is sufficient to say that the substance of the refused instruction was fully contained

in others given at the request of the defendant. By the fifth instruction the jury were told that the plaintiff could not recover unless it appeared, from a preponderance of the evidence, that the plaintiff exercised reasonable and ordinary care for his own safety, and the tenth, also given, was as follows:

10. "The jury are instructed, as a matter of law, that an employee himself must use due care and caution to avoid injury; and if he voluntarily exposes himself to any danger that he knew, or by reasonable attention or the exercise of ordinary prudence might have known, he thereby assumes all risks, and cannot recover for any injury resulting from his own acts."

The following instructions were also given:

14. "The court instructs the jury that it was the duty of the plaintiff, before starting the car, to examine those parts of the grip-car which appertain to the grip and brakes, and if he failed to do so, and his failure directly contributed to the injury, he cannot recover for any injury occasioned to him because of any defect in the grip, brakes or appurtenances thereof.

15. "If the plaintiff, by the use of ordinary care, could have discovered that the wrecking crew had not properly repaired the car, and if he failed to use such care, and that his failure so to do contributed directly to the injury, he cannot recover, and the burden of proving the use of such care is on the plaintiff."

Why should complaint be made because the court refused to multiply instructions on the same point?

As to the second point, it is claimed the following instruction, which was given on the court's own motion, was erroneous:

"You are also instructed, that when an injury results to a servant from an order improperly given or act negligently done, and the person who gives the order or does the act is in the performance of a duty the breach of which by the master, in person, would create a liability,

and he is clothed with apparent authority in that respect, and the order given or act done is within the scope of the apparent authority, the master is responsible in damages to the injured servant, if the injured servant is in the exercise of due care and caution for his own safety. It is immaterial whether the person exercising the authority was known as a foreman or by any other title, if he is clothed with apparent authority to direct and command, and the injured servant in good faith obeys and performs, the person so exercising such authority is not, as to the person injured, a fellow-servant, in the sense that the common master is relieved of responsibility for injuries resulting from his imprudent conduct or negligent act."

And in the same connection it is claimed that the court erred in modifying, and giving as modified, the sixteenth instruction asked by the defendant.   This is the instruction, with the modification in italics:

16.  "The jury are instructed, as a matter of law, that even if they believe, from the evidence, that the sliding bar was down on the left side of the car at the east end of the tunnel, and if they further believe, from the evidence, that the same sliding-bar was down at the time the plaintiff was injured, and that such sliding-bar being out of repair was the cause of the plaintiff's injuries, yet if the jury further believe, from the evidence, that the plaintiff, in the exercise of ordinary care, could have known, at the east end of the tunnel, that the sliding-bar in question was not repaired, then the court instructs the jury, as a matter of law, that the plaintiff assumed such peril and risks, and cannot recover in this case, *unless you further believe, from the evidence, that the plaintiff proceeded with the car in obedience to the orders of a superior who was authorized to give orders in behalf of defendant, and that the danger was not of such a nature as to threaten immediate injury, and that a reasonably prudent man in the position of plaintiff would be justified in presuming that by the exercise of extraordinary care and caution he might proceed with safety,*

*and that the plaintiff exercised that degree of care commensurate with the probable danger. What the facts are in these as in all other respects you must decide from a fair preponderance of all the evidence."*

Counsel's criticism may be best stated in their own language, thus: "We contend, * * * as applied to the facts in this case, that plaintiff's instruction number 6, and defendant's sixteenth instruction as modified, were manifestly erroneous, and calculated to mislead the jury as to the elements necessary to constitute a superior officer or vice-principal. Instruction 6, which was given on behalf of the plaintiff, charges that 'it is immaterial whether the person exercising the authority was known as a foreman or by any other title, if he is clothed with apparent authority to direct and command.' This was manifestly unfair to the defendant. One may be clothed with a limited or special authority, and yet, if the negligence with which it is sought to charge the master did not in any way arise out of or result from the performance of his particular authority, the master will not be liable. In this case we have seen that Smith was, in one sense, the superior of everybody. In the spacing out of the cars going westward through the tunnel he had unquestioned authority over these gripmen, but he had nothing whatever to do with the condition of this grip, —the active force in this accident."

We do not think these instructions are open to the criticism made. If, in accordance with the meaning of the instruction, Smith was clothed by the defendant with apparent authority over the plaintiff in the respect mentioned, then he was not "clothed with a limited or special authority," as supposed by counsel, the exercise of which in no way operated to cause the injury. In considering these instructions it is proper to notice that the court, at defendant's request, also instructed the jury as follows:

11. "The jury must not presume that Smith, the starter, was the superior over the plaintiff. Unless they

are satisfied, from a preponderance of the testimony, that Smith was such superior they must conclude he was not."

12. "The plaintiff cannot recover in this case on the ground that the injury to him was caused by the negligence of Smith, the starter, unless the jury believe, from the evidence, that the plaintiff and the said Smith were not fellow-servants of the defendant, the West Chicago Street Railroad Company. Fellow-servants are servants of the same master engaged in the same line of the master's business, and who are habitually associated with each other in their usual duties in such a way that they can exercise an influence upon each other promotive of proper caution."

Taken as a series the instructions properly directed the jury as to the law on this branch of the case. It was a question of fact for the jury whether or not Smith was a fellow-servant with the plaintiff and acting as such, or whether he stood in the relation of the representative of the common master, clothed with authority to direct and command the plaintiff in respect to the circumstances that combined to cause the injury, in view of the instructions of the court defining to the jury the meaning, in law, of those terms. This court has had occasion in several cases to consider the general doctrine announced in these instructions, and which, in the main, we do not understand counsel to question. Without extending this opinion further in its discussion, reference is made to the following cases: *Chicago Anderson Pressed Brick Co.* v. *Sobkowiak,* 148 Ill. 573 ; *Chicago and Alton Railroad Co.* v. *May,* 108 id. 288; *Mobile and Ohio Railroad Co.* v. *Massey,* 152 id. 144; *Chicago and Eastern Illinois Railroad Co.* v. *Kneirim,* id. 458; *Wenona Coal Co.* v. *Holmquist,* id. 581; *Mobile and Ohio Railroad Co.* v. *Godfrey,* 155 id. 78; *Pullman Palace Car Co.* v. *Laack,* 143 id. 242. See, also, *Chicago, Milwaukee and St. Paul Railway Co.* v. *Ross,* 112 U. S. 377.

Finding no error in the record the judgment of the Appellate Court will be affirmed.   *Judgment affirmed.*